UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BRUCE LAMPHIER,

                Plaintiff,                               Hon. Ellen S.  Carmody

v.

                                              Case No. 1:11-cv-366

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/


**OPINION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act.  On September 8, 2011, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment.  (Dkt. #12).

        Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive.  The Commissioner has found that Plaintiff is not disabled within the meaning of the Act.  For the reasons stated below, the Court concludes that the Commissioner's decision is not supported by substantial evidence.  Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

2

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 36 years old on his alleged disability onset date.  (Tr. 165).  He successfully completed high school and worked previously as a cook, laborer, and production worker.  (Tr. 304, 311, 347-50).  Plaintiff applied for benefits on December 19, 2007, alleging that he had been disabled since February 28, 2005, due to depression, anxiety, nervousness disorder, back ache and muscle aches, and bi-polar disorder.  (Tr. 165-75, 303).  Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 87-164).  On December 4, 2009, Plaintiff appeared before ALJ Jose Anglada, with testimony being offered by Plaintiff, Plaintiff's mother, and vocational expert, Sandra Steele.  (Tr. 31-86).  In a written decision dated March 18, 2010, the ALJ determined that Plaintiff was not disabled.  (Tr. 14-25).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 1-5).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On February 15, 2006, Plaintiff was examined by Kerry Frieben, L.M.S.W. with Summit Pointe Behavioral Health Services.  (Tr. 614-24).  Plaintiff reported that he was depressed.

3

(Tr. 614).  The results of a mental status examination were unremarkable.  (Tr. 619-21).  Plaintiff was diagnosed with major depressive disorder, recurrent, unspecified and his GAF score was rated as 58.[1]  (Tr. 622).  Plaintiff was encouraged to attend therapy "at least once a week."  (Tr. 623).  Treatment notes dated March 27, 2006, reveal that Plaintiff's emotional difficulties have "been well stabilized" on his recently prescribed medication.  (Tr. 625).  Plaintiff's GAF score was rated as 65[2] and his prognosis was noted to be "good to excellent."  (Tr. 626).

Treatment notes dated July 20, 2006, indicate that Plaintiff "is feeling much better, is calmer and much less anxious."  (Tr. 641).  Plaintiff reported that he "is sleeping better throughout the night with no undue anxiety dreams or nightmares."  (Tr. 641).  Plaintiff reported that he "is active socially and with family" and "works regularly 40 hours a week and finds he is getting along very well with coworkers, as well as [his] supervisor."  (Tr. 641).  Plaintiff reported that he was "very pleased with his current symptom free status."  (Tr. 641).  Treatment notes dated January 15, 2007, indicate that Plaintiff was experiencing "good symptom control" on his medication regimen with "no undue side effects or adverse reactions."  (Tr. 639).  It was also reported, however, that Plaintiff was recently terminated from his job at McDonald's because Plaintiff was "not meeting their standards."  (Tr. 639).

On March 13, 2007, Plaintiff participated in an MRI examination of his brain the results of which were "unremarkable."  (Tr. 570).  On March 15, 2007, Plaintiff participated in an

---

[1]  The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV).  A GAF score of 58 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning."  DSM-IV at 34.

[2]  A GAF score of 65 indicates that the individual is experiencing "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 34.

electroencephalogram examination the results of which were "normal."  (Tr. 571).

On March 27, 2007, Plaintiff was examined by Harry Borsheim, L.L.P. with Summit Pointe Behavioral Health Services.  (Tr. 603-13).  Plaintiff reported that he enjoys "bowling and playing catch" and is "good with cars."  (Tr. 606).  Plaintiff also reported that he "does okay socially and has a few friends."  (Tr. 606).  The results of a mental status examination were unremarkable. (Tr. 608-10).  Plaintiff was diagnosed with major depressive disorder, recurrent, unspecified and his GAF score was rated as 57.  (Tr. 611).  Plaintiff was encouraged to participate in weekly counseling sessions.  (Tr. 612).

On April 25, 2007, Plaintiff participated in a neurodiagnostic consultation conducted by Dr. Ryan Yoder.  (Tr. 594-96).  The doctor's treatment notes reveal the following:

> This is a 38-year-old. . .gentleman with history of major depressive episodes who presents for possible mental status changes, mental retardation.  His aunt is with him today who helps provide history. She states that when he was in school, he was a normal student.  He states that he had difficulty with his classes, but he was able to pass each class and graduate from 12th grade.  He states that his favorite classes were gym and other things.  He also enjoyed math class.  He states that the last math class he took was some algebra.  After he graduated from the Battle Creek area high school, he moved to Traverse City.  He worked in a factory for some time and lived at home with his mom.  He had lost his job due to economic situation of the factory, and then was living with mom.  However, he was a significant financial constraint on mom because she had severe right-sided weakness from a stroke at age 38; and has fixed disability income.  So, about two years ago, he moved down from Traverse City to Battle Creek to live with his father.  He has had various temporary employment since that time.  His last job was two to three weeks ago with a temp agency doing a factory machine assembly.  He was very good at his job; however, it was only a temporary job, and so he was let go as planned.
>
> Family did notice that he had had significant change in his cognition starting about 10 years ago.  However, the aunt really has not been in

> contact with him since he has been living. . .in. . .Traverse City.
> When he moved back, he had a severe episode of depression last fall
> which really seemed to affect his cognition.  He had been driving a
> car, and his car had been parked and been hit two times, and he had
> had financial difficulty too, but then a third time, he ran a red light
> and so totaled his car and did not have money to purchase another
> one.  Lack of transportation has contributed to a depressive episode
> which was quite severe last fall.  He is being followed at Summit
> Pointe on a weekly basis and believes that is helping.  He is also now
> on a medication which he believes [is] helping also.  He has had
> several major depressive episodes in the past.  His first one was back
> when he was a junior high student.  He states that his cognition was
> affected at that time also.
>
> His aunt and him state that the reason they really are pursuing
> neurology consultation is for reassurance that there is not something
> going on that could be treatable for his cognitive difficulties.  There
> are no particular tasks such as tasks or job skills that he feels unable
> to perform.  Additionally, he is performing all his ADLs at home.  He
> does not require assistance with them.

(Tr. 594).  The results of physical and neurological examinations were unremarkable.  (Tr. 595).  The

doctor diagnosed Plaintiff with static encephalopathy[3] and recommended "a dementia work up to

rule out treatable cause of dementia."  (Tr. 596).  Dr. Yoder subsequently completed an addendum

to his assessment.  (Tr. 597).  Specifically, the doctor reported the following:

> I was able to obtain histories, notes on the patient from Pine Rest
> Christian Mental Health Services.  In summary, notes indicate that the
> patient developed a schizophreniform illness with psychotic features
> in around 1983 when he was in the 9th grade.  This is when he first
> began to have deterioration in his academic abilities.  He was pretty
> high functioning up to that point.  During his treatment for his
> psychotic symptom, he had a learning skill testing.  He advanced
> almost one grade level in reading, math and etc., with short treatment
> course of his psychotic symptoms.  His course has been complicated
> by severe depressive disorder of his father and some psychological

---

[3] Static encephalopathy refers to "a disease of the brain that does not get better or worse."  *See* Static
Encephalopathy, available at http://medical-dictionary.thefreedictionary.com/Static+encephalopathy (last visited on
September 19, 2012).

> pathology in his mother also.  But, he had a relatively good prognosis given his adaptive functioning for his psychosocial stressors.  Hence, the patient carries a likely diagnosis of static encephalopathy secondary to schizophreniform illness, which first developed back in the 9th grade.

(Tr. 597).

Treatment notes dated April 30, 2007, reveal that Plaintiff's "medications have been helping him." (Tr. 637).  Plaintiff reported that his medications help "lift his spirits" and that "little things do not irritate him anymore." (Tr. 637).  Plaintiff reported that he was "sleeping good and eating good" with "no complaints of side effects." (Tr. 637).  Plaintiff reported that "he enjoys his day." (Tr. 637).  The results of a mental status examination were unremarkable.  (Tr. 637).  Treatment notes dated August 7, 2007, reveal the following:

> Although patient denies or minimizes symptoms it's obvious[] he has a chronic condition.  He is called major depression recurrent unspecified but he is more disabled than somebody who subjectively says their depression is in remission or minimal.  He more likely represents a schizoaffective disorder that is reflected by his medication which includes Abilify.  He's also on Wellbutrin and Cymbalta.  Not knowing his history it's unclear to me the reason he would need two antidepressants at the same time.  I questioned him about mania and he not endorse symptoms.  He has had difficulty getting and maintaining employment.

(Tr. 635).

Treatment notes dated June 19, 2008, indicate that Plaintiff "is showing some improvement" and "is not nearly as depressed." (Tr. 841).  Plaintiff reported that he "is doing a few more things in and around the house" and "that overall he is beginning to feel a little bit better." (Tr. 841).

On September 22, 2008, Plaintiff began a four-week Work Adjustment Training

7

(WAT) evaluation with Goodwill Industries.[4]  (Tr. 446-50).  The objective of this evaluation was to assess Plaintiff's "feasability for competitive employment."  (Tr. 446).  During this evaluation, Plaintiff was employed in both a janitorial and manufacturing capacity.  (Tr. 446).  An October 22, 2008 report, reveals that Plaintiff "did not demonstrate the ability to work competitively."  (Tr. 450). Specifically, the evaluation concluded as follows:

> Bruce demonstrated he has the physical stamina to work a 30 hour work week.  Bruce appeared to do his best during the WAT.  His supervisor stated that it is unfortunate that his best is not in keeping with the expectations of employers.  Throughout the WAT his work behaviors such as wandering away from his work station, not returning from his break on time, and clocking into work and going outside for a cigarette instead of going to his work station are behaviors that will cause retention problems.  Bruce would also ask his co-workers and front office staff for cigarettes.  Each behavior was explained and corrected by the supervisor yet Bruce would continue these behaviors.  Bruce remained a pleasant and polite person and did not appear to maliciously behave in this manner.  Each time he was corrected he would say okay.  Bruce appears to have difficulty remembering.
>
> [Michigan Rehabilitation Services] counselor may want to assist Bruce with skills that will help him remember things better.  There were several times he was observed focused on a part that had dust on it and he would unnecessarily wipe it clean.  He demonstrated a good eye for quality but at the expense of good production.  Bruce should undergo a psychiatric evaluation for possible Obsessive Compulsive Disorder.  On several occasion[s] he was observed cleaning the same window for 30 to 40 minutes and vacuuming the same spot for 20 minutes.  When this evaluator spoke with him he stated he wanted to do a good job. During the WAT the most structured environment was in manufacturing.  Bruce found it difficult to follow that structure. Bruce did not demonstrate the ability to work competitively at this time.  His needs at minimum are supported employment.  [Michigan Rehabilitation Services] counselor may want to refer him to

---

[4]  The mission of Goodwill Industries is to "help individuals with barriers to employment experience the Power of Work by providing job training, support services and employment opportunities."  *See* Mission and History, available at http://www.goodwillcmh.org/about/mission-and-history (last visited on September 19, 2012).

Connections.

(Tr. 450).

On November 20, 2008, Plaintiff was examined by Dr. Bangalor Ramesh. (Tr. 920-21). Plaintiff reported that "he is feeling better" and "is looking forward to working a few hours." (Tr. 920). Plaintiff's father reported "that overall [Plaintiff] has done much better." (Tr. 920). The doctor also observed that "walking down the hallway [Plaintiff] was whistling" and "has more animation." (Tr. 920). Plaintiff was diagnosed with "major depressive disorder-in good remission." (Tr. 920).

On June 8, 2009, Sheila Hoppe, L.M.S.W., and Helena Puhalj, Physician's Assistant, completed a mental impairment questionnaire concerning Plaintiff's emotional impairments. (Tr. 975-80). The examiners evaluated Plaintiff's mental abilities and aptitudes to perform work in 25 separate categories, such as the ability to remember/carry out instructions, deal with work stress, get along with others, and work with interference from psychologically-based symptoms. (Tr. 977-78). In one category, Plaintiff's abilities were rated as "limited but satisfactory." (Tr. 978). In seven categories, Plaintiff's abilities were rated as "seriously limited, but not precluded." (Tr. 977-78). In 13 categories, Plaintiff's abilities were characterized as "unable to meet competitive standards." (Tr. 977-78). In four categories, Plaintiff's abilities were rated as "no useful ability to function." (Tr. 977-78). The examiners also reported that Plaintiff experienced "marked" restrictions of activities of daily living and difficulties in maintaining social functioning. (Tr. 978). They reported that Plaintiff experienced "moderate" difficulties in maintaining concentration, persistence or pace and never experienced episodes of decompensation. (Tr. 978).

On August 24, 2009, Plaintiff reported that "he is feeling much better...is not as

9

irritable or angry...[and that] his moods have been stable."  (Tr. 1015).  Treatment notes dated

September 11, 2009, indicate that Plaintiff "communicates well with others...is friendly and takes

daily walks...enjoys repairing things...[and] is good at cleaning the house." (Tr. 991).  Plaintiff also

reported that he "get[s] along with most everybody" and wants to "get a part time job."  (Tr. 991).


## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating

disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[5]  If the Commissioner can make a

dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§

404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional

impairment as well as an exertional impairment, both are considered in determining his residual

functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders,

and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable

to perform his previous work, and cannot, considering his age, education, and work experience,

---

[5] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled"
     regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R.
   404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration
   requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No.
   4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled"
   must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors
    including age, education, past work experience, and residual functional capacity must be considered to
    determine if other work can be performed (20 C.F.R. 404.1520(f)).

perform any other substantial gainful employment existing in significant numbers in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from affective disorder and anxiety-related disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 16-18).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform a "full range of work at all exertional levels" subject to the following non-exertional limitations: (1) he possesses a moderate ability to understand, remember, and carry out detailed instructions; (2) he possesses a moderate ability to maintain attention and concentration for extended periods; (3) he possesses a moderate ability to respond appropriately to changes in the work setting; and (4) he would be unsuited for work requiring production quotas and demand for fast-paced activity.  (Tr. 18).

The ALJ concluded that Plaintiff was unable to perform any of his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.  While the ALJ is not required to

11

question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Sandra Steele.

The vocational expert testified that there existed approximately 10,100 jobs in the lower peninsula of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 81-82). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

a.      Evaluation of the Medical Record

As noted above, social worker Sheila Hoppe and Physician's Assistant Helena Puhalj, completed a report on June 8, 2009, indicating that Plaintiff experienced much more severe non-exertional limitations than recognized by the ALJ. Plaintiff asserts that the ALJ was required to afford "controlling weight" to their opinions.

The treating physician doctrine recognizes that medical professionals who have a long

history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham*

13

*v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th

Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant

to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

Pursuant to the relevant Social Security regulations neither Sheila Hoppe nor Helena

Puhalj are considered "acceptable medical sources." *See* 20 C.F.R. § 404.1513. Thus, as Defendant

correctly asserts, because neither Hoppe nor Puhalj are acceptable medical sources, the ALJ was not

obliged to accord any special deference to their opinions. *See Kornecky v. Commissioner of Social

Security*, 167 Fed. Appx. 496, 506 (6th Cir., Feb. 9, 2006) ("a treating physician is 'your own

physician, psychologist, or other acceptable medical source'").

Accordingly, Plaintiff's argument that the ALJ was *required* under the Treating

Physician Doctrine to accord controlling weight to the opinions in question is rejected. As discussed

below, however, the Court also concludes that the ALJ's assessment of these opinions is not

supported by substantial evidence, a relevant determination when assessing whether the ALJ's RFC

determination is supported by substantial evidence.


        b.      ALJ's Consideration of Vocational Rehabilitation Evidence

As discussed above, in September 2008, Plaintiff began a four-week Work

Adjustment Training evaluation with Goodwill Industries, the objective of which was to assess

Plaintiff's "feasability for competitive employment." After working in both a janitorial and

manufacturing capacity, it was determined that Plaintiff "did not demonstrate the ability to work

competitively." While the ALJ's opinion is thoughtful and thorough, he did not make any mention

of this particular evidence.

Plaintiff argues that the failure by the ALJ to address this particular evidence is, by itself, a sufficient basis for relief.  Stated differently, Plaintiff is asserting a procedural right to have the ALJ expressly discuss every item of evidence in the record, including evidence from a non-medical source such as Goodwill Industries.  As Defendant correctly notes, however, no such right exists.  Thus, to the extent that Plaintiff asserts that he is entitled to relief on the ground that the ALJ failed to discuss the evidence in question, such argument is rejected.  As discussed below, however, the evidence of Plaintiff's experience at Goodwill Industries is particularly relevant and the ALJ's apparent discounting of such is significant in the context of determining whether the ALJ's RFC determination is supported by substantial evidence.

       c.       The ALJ's RFC Determination is Not Supported by Substantial Evidence

As detailed above, the ALJ assessed Plaintiff's residual functional capacity and concluded that Plaintiff retains the ability to perform a "full range of work at all exertional levels" subject to some very minimal non-exertional limitations.  Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence.  The Court agrees.

As previously noted, Sheila Hoppe and Helena Puhalj have expressed the opinion that Plaintiff experiences much more severe non-exertional limitations than recognized by the ALJ.  The ALJ's rationale for rejecting these particular opinions is unpersuasive.  In discounting Hoppe's and Puhalj's opinions, the ALJ stated:

> Ms. Hoppe and Puhalj further indicated the claimant has no useful ability to function, is unable to meet competitive standards, or is seriously limited in every aptitude needed to do even unskilled work. Interestingly, the claimant was referred to Ms. Hoppe *because* it was felt he was able to work *and* these two clinicians were instrumental

15

in helping the claimant look for work.  Their check marks on the Questionnaire are wholly incompatible with the jobs they were actually performing supposedly in the claimant's best interests.

(Tr. 23).

In essence, the ALJ discredited the opinions in question not because such were inconsistent with the evidence, but on the ground that because Ms. Hoppe and Ms. Puhalj were enlisted to assist Plaintiff obtain work they are somehow precluded from subsequently concluding that Plaintiff suffers from certain deficiencies and limitations that impair his ability to secure work. By this logic, if a claimant were referred to a physician for treatment, any subsequent opinion by the physician that the claimant suffered from an untreatable illness would be rejected on the ground that such was inconsistent with the purpose of the referral.  The absurdity of such logic should be readily apparent.

Moreover, the opinions expressed by Ms. Hoppe and Ms. Puhalj are supported by and consistent with much of the evidence in this matter.  The evidence indicates that Plaintiff experienced a schizophreniform illness with psychotic features as a teenager and also suffered some sort of permanent brain injury that judging by the evidence has affected his cognitive functioning. Plaintiff's performance during his Work Adjustment Training experience at Goodwill Industries likewise demonstrates that he experiences serious non-exertional impairments that limit him to an extent far beyond that recognized by the ALJ.  There is evidence that Plaintiff was terminated from another position because he was "not meeting [the employer's] standards."  This evidence is consistent with and supports the opinions expressed by Ms. Hoppe and Ms. Puhalj.

As for the ALJ's failure to discuss the evidence of Plaintiff's failed rehabilitation experience at Goodwill Industries, such clearly signals that the ALJ accorded little, if any, weight

16

to such.  This evidence, however, is certainly relevant to any assessment of Plaintiff's non-exertional limitations and his ability to function in the workplace.  Moreover, this evidence is consistent with substantial evidence in the record that Plaintiff experiences far greater limitations than recognized by the ALJ.  The Court recognizes that there is evidence that Plaintiff's depression has responded favorably to medication; however, there is no evidence that Plaintiff's brain injury or other emotional difficulties have similarly responded to treatment or therapy.  In sum, given the wealth of relevant evidence demonstrating that Plaintiff suffers from far more extensive non-exertional impairments than recognized by the ALJ, the Court concludes that the ALJ's RFC determination is not supported by substantial evidence.

The vocational expert testified that given Plaintiff's RFC, there existed a significant number of jobs which Plaintiff could perform despite such limitations.  However, the ALJ's RFC determination is not supported by substantial evidence.  Because the vocational expert's testimony was premised upon a faulty RFC determination, the ALJ's reliance thereon does not constitute substantial evidence.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of his disability is "compelling."  *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling).  While the ALJ's decision is not supported by substantial evidence, there does not exist *compelling* evidence that Plaintiff is disabled.  Evaluation of Plaintiff's

17

claim requires the resolution of factual disputes which this Court is neither authorized nor competent to undertake in the first instance.  The Court concludes, therefore, that the Commissioner's decision be reversed and this matter remanded for further factual findings.


## <u>CONCLUSION</u>

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence.  The Court further finds that there does not exist compelling evidence that Plaintiff is disabled.  Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.  A judgment consistent with this opinion will enter.


Date:  September 27, 2012                          /s/ Ellen S. Carmody
                                                   ELLEN S. CARMODY
                                                   United States Magistrate Judge